IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY SHANE HIXSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | No. 14-1087-JDT-cgc |
| ) | |
| STATE OF TENNESSEE, ET AL., ) | |
| ) | |
| Defendants. ) | |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
CERTIFYING AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
AND NOTIFYING PLAINTIFF OF APPELLATE FILING FEE

On April 8, 2014, the *pro se* prisoner Plaintiff, Timothy Shane Hixson, who is presently incarcerated at the Riverbend Maximum Security Institution in Nashville, Tennessee, filed a complaint pursuant to 42 U.S.C. § 1983 in the U.S. District Court for the Middle District of Tennessee. (ECF No. 1.) The complaint concerns Hixson's previous confinement at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee. On April 11, 2014, U.S. District Judge Kevin H. Sharp assessed the civil filing fee pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(a)-(b), and transferred the case to this district, where venue is proper. (ECF No. 3.) Subsequently, Plaintiff filed a motion for additional time to amend the complaint (ECF No. 7), which this Court granted (ECF No. 11). An amended complaint was filed on March 30, 2015. (ECF No. 12.)

On March 31, 2015, the Court issued an order dismissing portions of the amended complaint denying Plaintiff's motions for appointment of counsel, dismissing portions of the complaint and

directing that process be served on Defendants Corizon, Inc. and Dr. John Hochberg. (ECF No. 13.) Following service of process, the Defendants filed a motion for summary judgment on April 6, 2016. (ECF No. 42.) Plaintiff has not filed a response to the summary judgment motion.

Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Rule 56(c)(1) provides that "[a] party asserting that a fact cannot be or is genuinely disputed" is required to support that assertion by:

    (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials;[1] or

    (B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)" the district court may:

    (1)    give an opportunity to properly support or address the fact;

    (2)    consider the fact undisputed for purposes of the motion;

---

[1] "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Additionally, Rule 56(c)(4) specifically provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

> (3) grant summary judgment if the motion and supporting materials– including the facts considered undisputed–show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

> In *Celotex Corp.*, the Supreme Court explained that Rule 56:
>
> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

477 U.S. at 322-23. However, where the party moving for summary judgment also has the burden of persuasion at trial, the initial burden on summary judgment is higher. Under those circumstances, the moving party must show "that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012) (internal quotation marks omitted).

In considering whether to grant summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (same). However, the Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The fact that a plaintiff does not respond does not require granting a motion for summary judgment. Nevertheless, if the allegations of the complaint are contravened by the defendants' evidence and the defendants are entitled to judgment as a matter of law on those facts, then summary judgment is appropriate. *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979).

Plaintiff's allegations against the Defendants are accurately set out in the motion for summary judgment:

> In December 2012 Plaintiff put in several sick calls because he was having severe pain in the abdominal area. (ECF 1; "Compl." p. 3). Plaintiff has had Hepatitis C for years and had been treated with Interferon. (*Id.*) The combination of the disease and treatment resulted in liver problems. Each time Plaintiff submitted sick call requests, Dr. Hochberg told him it was normal to have such pain from time to time due to his pre-existing medical conditions. (*Id.*)
>
> Plaintiff continued to complain of pain. (*Id.*) In July 2013, he got Dr. Hochberg's attention when he noticed Plaintiff's skin and eyes were yellow. (*Id.*) Dr. Hochberg then ordered blood tests. On July 12, 2013, Plaintiff was seen by Nurse Practitioner Amanda Collins, who informed him the blood tests might indicate liver cancer and he needed an ultrasound. (*Id.*) Plaintiff asked Ms. Collins if the Tennessee Department of Corrections was going to pay for specialized treatment or for a liver transplant, if that was what he needed. (*Id.* at 3-4.) Ms. Collins told Plaintiff they would not pay for those types of treatments and the tests were needed only for their records. (*Id.*)
>
> On July 30, 2013, an ultrasound was performed but Plaintiff did not receive the results. (*Id.*) He placed sick call requests to see Dr. Hochberg for pain medication. (*Id.* at 4.) On August 21, 2013, Plaintiff finally got to see Dr. Hochberg, who informed him that he did not have cancer, but his gallbladder needed to be taken out. (*Id.*) Dr. Hochberg prescribed Tylenol for his abdominal pain. When Plaintiff went to pick up the medication, the nurse would not provide it because Tylenol is contra-indicated for someone with Plaintiff's liver condition. (*Id.*)
>
> Dr. Hochberg quit his job at Northwest Correctional Complex ("NWCX") a few days after he saw Plaintiff. (*Id.*) For several weeks there was no doctor at the facility and Plaintiff was told there was no one who could prescribe anything for him. On October 24, 2013, he was transferred to Riverbend Maximum Security Institute. Plaintiff did not receive any pain medication before his transfer. (*Id.*)

(ECF No. 43 at 2-3.)

4

Defendants contend that all of Plaintiff's claims based on conduct occurring after July 13, 2013, are barred by his failure to exhaust his administrative remedies. Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *See Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit."). However, a prisoner is not required to demonstrate exhaustion in his complaint. *Jones*, 549 U.S. at 216. Failure to exhaust is an affirmative defense on which the defendant has the burden of proof. *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011); *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011).

Section 1997e(a) requires not merely exhaustion of the available administrative remedies, but *proper exhaustion* of those remedies, meaning that a prisoner must comply with the institution's "critical procedural rules," such as time limits for filing grievances. *Woodford v. Ngo*, 548 U.S. 81 (2006).

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Id.* at 95. *See also Jones*, 549 U.S. at 218. The Sixth Circuit requires prisoners "to make 'affirmative efforts to comply with the administrative procedures,' and analyzes whether those 'efforts to exhaust were sufficient under the circumstances.'" *Risher*, 639 F.3d at 240 (quoting

5

*Napier*, 636 F.3d at 224). "[I]f the plaintiff contends he was prevented from exhausting his remedies . . . the defendant [must] present evidence showing that the plaintiff's ability to exhaust was not hindered." *Surles*, 678 F.3d at 458 n.10.

Attached to the complaint is a grievance filed by Plaintiff on July 13, 2013, in which he complained of his medical treatment for "the past [eight] months" and asserted that if a blood test had been performed earlier, he "may have had some simple treatments to cure" his condition. (ECF No. 1-3 at 5-6.) However, Defendants assert there is no evidence in the record that Plaintiff filed any other grievances complaining about actions or omissions by the Defendants occurring after July 13, 2013.

Because Plaintiff has not responded to the motion for summary judgment he has failed to offer evidence that he filed additional relevant grievances or that he was hindered in his attempts to do so. Therefore, all of Plaintiff's claims arising after July 13, 2013, are barred by the failure to exhaust his available administrative remedies.

"A private corporation that performs the traditional state function of operating a prison acts under color of state law for purposes of § 1983." *Thomas v. Coble*, 55 F. App'x 748, 748 (6th Cir. 2003) (citing *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996)); *see also Parsons v. Caruso*, 491 F. App'x 597, 609 (6th Cir. 2012) (corporation that provides medical care to prisoners can be sued under § 1983). The Sixth Circuit has applied the standards for assessing municipal liability to claims against private corporations that operate prisons or provide medical care to prisoners. *Thomas*, 55 F. App'x at 748-49; *Street*, 102 F.3d at 817-18; *Johnson v. Corr. Corp. of Am.*, 26 F. App'x 386, 388 (6th Cir. 2001). CCA "cannot be held liable under a theory of respondeat superior." *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011). Instead, to

6

prevail on a § 1983 claim against CCA, Plaintiff "must show that a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of his rights. *Id.*

In this case, Plaintiff's claims against Corizon fail because he has submitted no evidence that any harm he suffered was due to an official policy or custom of Corizon. For that reason alone, Corizon is entitled to judgment as a matter of law on all of Plaintiff's claims.

The Eighth Amendment prohibits cruel and unusual punishments. *See generally Wilson v. Seiter*, 501 U.S. 294 (1991). "The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishments Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment." *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). "A prisoner's right to adequate medical care 'is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs.'" *Id.* at 874 (quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)); *see also Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

An Eighth Amendment claim consists of both objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson*, 501 U.S. at 298; *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011); *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010). The objective component of an Eighth Amendment claim based on a lack of medical care requires that a prisoner have a serious medical need. *Blackmore*, 390 F.3d at 895; *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would readily recognize the necessity for a doctor's attention.'" *Blackmore*, 390

F.3d at 897; *see also Johnson*, 398 F.3d at 874. In this case, Defendants do not dispute that Plaintiff had a serious medical condition.

To establish the subjective component of an Eighth Amendment violation, a prisoner must demonstrate that the official acted with the requisite intent, that is, that he had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834; *see also Wilson*, 501 U.S. at 302-03. The plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the prisoner would suffer serious harm. *Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303; *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009); *Woods v. Lecureux*, 110 F.3d 1215,1222 (6th Cir. 1997). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. A prison official cannot be found liable under the Eighth Amendment unless he subjectively knows of an excessive risk of harm to an inmate's health or safety and also disregards that risk. *Id.* at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to cruel and unusual punishment. *Id.* at 838.

Defendants contends they are entitled to judgment as a matter of law because they did not violate Plaintiff's Eighth Amendment rights. In support of the motion for summary judgment, Defendants rely on the Affidavit of Corizon's Chief Legal Officer, Scott King, Esq. (King Aff., ECF No. 44), Defendant Hochberg's Affidavit (Hochberg Aff., ECF No. 45), and Plaintiff's medical records (ECF Nos. 45-1 to 45-9).

The undisputed evidence in the record shows that when Plaintiff arrived at the NWCX in September 2012, a Physician's Assistant ("PA") noted that he had HIV and ordered various medications for treatment of that condition. (Hochberg Aff., ECF No. 45 ¶ 3.) Plaintiff was seen

on December 4, 2012, via teleconference by an infectious disease specialist, who issued orders for various testing. (*Id.*, ¶ 4.) Plaintiff saw Dr. Hochberg in December 2012 for a follow-up after his teleconference with the infectious disease specialist, and Dr. Hochberg continued Plaintiff's current medications. (*Id.*, ¶ 5.) Also in December 2012, Plaintiff had a positive RPR test, which indicated the presence of latent syphilis, and antibiotics were prescribed. (*Id.*, ¶ 6.) Dr. Hochberg states that this positive test was not relevant to any complaints of abdominal pain, diarrhea or jaundice. (*Id.*)

Plaintiff first complained to Defendant Hochberg of diarrhea on February 22, 2013. (*Id.,* ¶ 7.) However, Hochberg's examination of Plaintiff showed no abnormalities and that Plaintiff had not lost any weight. Plaintiff did not complain of abdominal pain at that time. Hochberg prescribed Immodium for the diarrhea. Because Plaintiff's CD4 cell count was somewhat low, Hochberg planned to retest and refer him to a infectious disease specialist if the lab results did not improve. (*Id.*)[2] On February 28, 2013, lab tests showed that Plaintiff's HIV was undetectable. (*Id.*, ¶ 8.)

From March 2013 to May 2013, Dr. Hochberg saw Plaintiff on several occasions for treatment of his various medical conditions, ordering lab tests and medications as needed. In April 2013, Plaintiff signed an "against medical advice" form for refusing his HIV medications because he did not want to get up early; he requested the timing of the medications be changed. Dr. Hochberg saw Plaintiff in May 2013 and ordered that his HIV medications be changed to noon and 7:00 p.m. each day. Although lab tests performed on May 8th showed Plaintiff's HIV viral load was abnormal, by July 17, 2013, it had returned to a non-detectable level. (*Id.* ¶¶ 9-10.)

---

[2] Hochberg states that "CD4 cell counts are indicative of how well an HIV patient's immune system is functioning.

9

During a chronic care visit with Dr. Hochberg on July 3, 2013, Plaintiff again reported no nausea, vomiting, abdominal pain or swelling, or diarrhea. He had no new symptoms and had gained weight. Plaintiff's liver function test was slightly elevated at 46, but that was improved from previous tests. Dr. Hochberg noted that Plaintiff was not compliant with his diet or exercise, and there was some jaundice of Plaintiff's eyes. Dr. Hochberg ordered lab tests and planned for Plaintiff to teleconference with the infectious disease specialist after the results were obtained. (*Id.* ¶ 11.)

Blood was drawn from Plaintiff on July 10, 2013, and the lab results showed increased bilirubin, which is common in patients with Hepatitis C but may also indicate gallbladder disease. The results also showed an abnormal AFP (a tumor marker) of 66, which is not associated with gallbladder disease. Hochberg states that abnormal AFP "may indicate but is not diagnostic for cancer." (*Id.* ¶ 13.) While the AFP was not high enough to require "urgent or emergent referral for further testing," Hochberg ordered an abdominal ultrasound in order to obtain additional diagnostic information. (*Id.*)

On July 12, 2013, Plaintiff told the PA that he was "not really" having nausea or vomiting but had been having diarrhea for the past six months or more. He had no abdominal pain "that day" and reported feeling better over the last two weeks. Plaintiff also reported that a week or so ago he had been "yellow all over." The PA noted no acute distress, some jaundice in the whites of Plaintiff's eyes, but no jaundice of the skin. The PA noted that the abdominal ultrasound had been ordered. (*Id.* ¶ 14.)

Plaintiff was seen by a nurse on July 19, 2013, complaining that he had had knots in his mid-sternum and right breast for eight months, which had recently become painful. The nurse's examination showed hard, quarter-sized areas and noted that Plaintiff would be referred to a medical

10

provider. (*Id.* ¶ 15.) However, Dr. Hochberg did not see Plaintiff for that particular condition, and there are no further references to those complaints in Plaintiff's medical records for the relevant time period. (*Id.*)

On July 25, 2013, Plaintiff was seen by a nurse for swelling in his lower legs. The nurse noted that his skin was yellow, and his abdomen was slightly distended, but he did not report any pain. The nurse assessed an alteration in Plaintiff's fluid balance. Dr. Hochberg states that leg-swelling may be associated with chronic Hepatitis C. (*Id.* ¶ 16.)

Plaintiff was admitted to the prison infirmary on July 29, 2013, in preparation for the ultrasound the next day. Plaintiff reported he had been having pain in his upper abdomen for the past eight months with a bubbling feeling; he rated his current pain as seven out of ten. A nurse noted jaundice of the eyes and skin, and Plaintiff reported multiple loose stools during the day. (*Id.* ¶ 17.) When the ultrasound was performed on July 30, 2013, it revealed a gallstone in the neck of the gallbladder but no tumors or other abnormalities in the liver, kidneys or other areas. The ultrasound also revealed thickening of the gallbladder wall, which could be associated with inflammation caused by the gallstone, and enlargement of the spleen, related to Plaintiff's Hepatitis C. (*Id.* ¶ 18.) Dr. Hochberg states that in light of the ultrasound findings, Plaintiff's jaundice during that time period was probably due primarily to the gallbladder condition, although his Hepatitis C could also have contributed to the jaundice. (*Id.* ¶¶ 16, 26.)

Plaintiff saw Dr. Hochberg on August 21, 2013, complaining of abdominal pain. Dr. Hochberg found no signs of gallbladder inflammation such as upper right quadrant pain, nausea, vomiting or loss of apetite. He prescribed TUMS and also Tylenol for pain, two pills three times a day for thirty days. On August 28, 2013, Hochberg also submitted a request for a surgical consult

for Plaintiff's gallbladder condition, which was approved by the Regional Medical Director on August 30, 2013. (*Id.* ¶ 19.)

On August 23, 2013, Plaintiff was dispensed sixty Tylenol pills. He requested additional pain medication from a nurse during sick call on September 6, 2013, complaining of pain in his mid-section. He told the nurse he could not take the Tylenol that had been ordered because of his liver disease and was referred to a medical provider for a possible medication change. (*Id.* ¶ 20.) However, Dr. Hochberg states that Tylenol is not contra-indicated for someone with liver disease such as Hepatitis C; instead, it is a matter left to the judgment of a medical provider. (*Id.* ¶ 24.) He states that the Tylenol he prescribed for Plaintiff was in an acceptable dosage and that Plaintiff's liver function tests were only mildly elevated. Given Plaintiff's level of pain from his gallbladder, Dr. Hochberg was of the opinion that Tylenol was the appropriate choice. (*Id.*)

Dr. Hochberg further states there was no medical indication that would have required any earlier or different tests for Plaintiff other than what Hochberg ordered. (*Id.* ¶¶ 25-26.) It was not until July 12, 2013, that Plaintiff reported to a PA that he had been experiencing abdominal pain for eight months; in fact, he denied any such pain. While Plaintiff complained of diarrhea, that is not a symptom of gallstones. Plaintiff also had no elevated white blood count, which was normal on lab results on July 11, 2013. (*Id.* ¶ 27.)

Dr. Hochberg did not provide any medical care to inmates at the NWCX after September 8, 2013, as Corizon's contract to provide such services expired on that date. (*Id.* ¶¶ 21, 23; King Aff., ECF No. 44 ¶ 2.)

The undisputed evidence in the record, in particular Plaintiff's medical records as described by Defendant Hochberg in his Affidavit, demonstrates that Defendant Hochberg did not, at any

relevant time, act with deliberate indifference in the provision of medical care to Plaintiff. Plaintiff was provided with frequent care that appropriately treated his various conditions and complaints. Therefore, the Court concludes there are no genuine issues of material fact for trial in this matter.

For all of the foregoing reasons, the Defendants' motion for summary judgment is GRANTED.

Pursuant to 28 U.S.C. § 1915(a)(3), the Court must also consider whether an appeal by Plaintiff in this case would be taken in good faith. The good faith standard is an objective one. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). The test for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any issue that is not frivolous. *Id.* The same considerations that lead the Court to grant summary judgment also compel the conclusion that an appeal would not be taken in good faith.

Therefore, it is CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith.

The Court must also address the assessment of the $505 appellate filing fee if Plaintiff nevertheless appeals the dismissal of this case. A certification that an appeal is not taken in good faith does not affect an indigent prisoner plaintiff's ability to take advantage of the installment procedures contained in § 1915(b). *See McGore v. Wrigglesworth*, 114 F.3d 601, 610-11 (6th Cir. 1997), *partially overruled on other grounds by LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013). *McGore* sets out specific procedures for implementing the PLRA, 28 U.S.C. § 1915(a)-(b). Therefore, the Plaintiff is instructed that if he wishes to take advantage of the installment procedures for paying the appellate filing fee, he must comply with the procedures set out in *McGore* and

§ 1915(a)(2) by filing an updated *in forma pauperis* affidavit and a current, certified copy of his inmate trust account for the six months immediately preceding the filing of the notice of appeal.

The Clerk is directed to prepare a judgment.

IT IS SO ORDERED.

                                           s/ **James D. Todd**
                                           JAMES D. TODD
                                           UNITED STATES DISTRICT JUDGE